## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**NICOLE FRIED,** in her official
capacity as the Commissioner of Agriculture;
and **VERA COOPER, NICOLE HANSELL**
**and NEILL FRANKLIN,**

                Plaintiffs,               **CASE NO:** 4:22-CV-00164-AW-MAF

v.

**MERRICK GARLAND**, in his official
capacity as Attorney General of the United
States; **GARY RESTAINO**, in his
official capacity as Acting Director of the
Bureau of Alcohol, Tobacco, Firearms, and
Explosives; and **THE UNITED STATES**
**OF AMERICA,**

                Defendants.
_____/

## AMENDED COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF

COMES NOW, Plaintiffs, Nicole Fried ("Commissioner Fried"), in her

official capacity as the agency head of the Florida Department of Agriculture and

Consumer Services Commissioner ("FDACS"), Vera Cooper ("Cooper"), Nicole

Hansell ("Hansell"), and Neill Franklin ("Franklin") (Cooper, Hansell, and Franklin

collectively referred to as the "Individual Plaintiffs; Commissioner Fried and the

Individual Plaintiffs collectively referred to as "Plaintiffs"), and file this Amended

Complaint for Declaratory and Injunctive Relief against Defendants Merrick Garland, in his official capacity as Attorney General of the United States ("Attorney General Garland"), Gary Restaino, in his official capacity as Acting Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("Director Restaino"), and the United States of America ("United States") (collectively, "Defendants"), and alleges as follows:

### Introduction

1.      As Justice Clarence Thomas recently noted, the United States' current policies regarding marijuana amount to:

> "a half-in, half-out regime that simultaneously tolerates and forbids local use of marijuana. This contradictory and unstable state of affairs strains basic principles of federalism and conceals traps for the unwary."
>
> *Standing Akimbo, LLC v. U.S.*, 141 S. Ct. 2236, 2236-2237 (2021) (Thomas, C., respecting the denial of certiorari).

2.      The United States' "current approach to marijuana bears little resemblance to the watertight nationwide prohibition" which it previously enforced. *Id.* at 2238. Justice Thomas deemed this current approach to be "more episodic than coherent." *Id.*

3.      Even the previous "watertight nationwide prohibition" that Justice Thomas referenced is only a recent American principal or policy. As the Supreme Court has noted, marijuana "was not significantly regulated by the federal

government until 1937…" *Gonzalez v. Raich*, 545 U.S. 1, 11 (2005) *citing* L. Grinspoon & J. Bakalar, *Marihuana: The Forbidden Medicine,* p. 7-8 (ed. 1997) ("*Grinspoon & Bakalar*").

4.    Before that time, for at least a significant period, it was legal and not uncommon for doctors in America, England, and other western nations to prescribe marijuana to patients for medicinal use. *Grinspoon & Bakalar*, p. 3-7.

5.    Marijuana was classified as a Schedule 1 controlled substance, and its use was made criminal, in 1970. *Gonzalez*, 545 U.S. at 14.

6.    Sections 922(d)(3) and 922(g)(3) of the Federal Criminal Code (collectively, the "Challenged Sections") forbid persons from possessing or purchasing a firearm on the sole basis that they are medical marijuana patients, even if they are in compliance with state law.

7.    The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") has expressly promulgated this interpretation of the Challenged Sections through 27 C.F.R. § 478.11 and Form OMB No. 1140-0020 (collectively, the "Challenged Regulations).

8.    The "precursor" to the Challenged Sections and Challenged Regulations was passed in 1968. *U.S. v. Carter*, 669 F. 3d 411, 417 (4th Cir. 2012). It sought "broadly to keep firearms away from the persons [it] classified as

potentially irresponsible and dangerous." *Id. citing Barrett v. U.S.*, 415 U.S. 814, 824 (1974). Even that law contained "a number of loopholes," however, such as criminalizing "the receipt – not the possession – of firearms." *Id.* These loopholes were not closed until 1986. *Id.*

9.     Prior to that time, the medicinal use of marijuana was not amongst the legal basis for preventing an individual from purchasing or possessing a firearm. This was also the case in or around 1791, when the Second Amendment was ratified.

10.     Rather, much like the Twentieth Century laws referenced above, firearm regulations during that period focused on individuals deemed dangerous or seditious. *See* Greenlee, Joseph G.S. (2020) "The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms," *Wyoming Law Review*: Vol. 20: No. 2, Article 7, p. 257 ("*Greenlee*"). There is no historical indication that medical marijuana use rendered a person dangerous in the eyes of the government during the period surrounding the Second Amendment's ratification, or at any time prior to the mid-Twentieth century.

11.     Further, the Challenged Sections and Challenged Regulations currently exist in a much different policy landscape than the previous "watertight nationwide prohibition" that Justice Thomas referenced. Since 1996, a majority of states have enacted medical marijuana programs through which eligible citizens may use and

possess marijuana in compliance with state law. *Standing Akimbo*, 141 S. Ct. at 2237. Florida is one of those states.

12.     Although marijuana remains a Schedule 1 controlled substance, Congress has included a budget rider every year since federal fiscal year 2015 precluding the Department of Justice from using any appropriated funds to prevent the implementation of any state or territory's medical marijuana programs. *See* Consolidated Appropriations Act, 2022, § 531 (attached as Exhibit A and commonly referred to as the "Rohrabacher-Farr Amendment").

13.     Thus, medical marijuana programs continue to expand with the express protection of the federal government. Further, individuals may participate in those programs without the risk of criminal arrest or prosecution. *See United States v, McIntosh*, 833 F. 3d 1163 (9th Cir. 2016); *U.S. v. Bilodeau*, 24 F. 4th 705, 714 (1st Cir. 2022).

14.     Nothing in Florida law prohibits medical marijuana patients from purchasing or possessing firearms. FDACS "shall" issue a license to carry concealed weapons or firearms to all persons meeting certain qualifications. *See* § 790.06(2), Fla. Stat. Medical marijuana use, in and of itself, is not relevant to these qualifications. *Id.* Generally, Florida law does not intend for eligible citizens who

participate in and comply with the state's medical marijuana program to suffer any legal consequences, at least as it relates to firearm possession, for doing so.

15.     Recently, the Supreme Court put forward the following test relating to the legality of restrictions on a citizen's right to own and bear arms:

> In keeping with [*District of Columbia v. Heller,* 554 U.S. 570 (2008)], we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

> *New York State Rifle and Pistol Assn., Inc. v. Bruen*, 597 U.S. _____ (2022), No. 20-843.

16.     Quite simply, there is no historical tradition of denying individuals their Second Amendment rights based solely (or even partially) on the use of marijuana.

17.     This is particularly true for medical marijuana patients such as Cooper and Hansell, who comply with Florida's medical marijuana laws and act in reliance upon the Rohrabacher-Farr Amendment. These patients, as part of the treatment medically recommended to them, only engage in activity they are legally permitted to take and that they know will not expose them to punishment or liability under state or federal law.

18.     The Defendants cannot reasonably analogize such compliant medical marijuana patients to either felons or to persons who historically lost their gun rights due to criminal or "dangerous" behavior. Accordingly, the Challenged Sections and Regulations, as applied to state medical marijuana patients such as Cooper and Hansell, violate the Second Amendment.

19.     Although Franklin is not currently a medical marijuana patient, he has been deemed medically eligible for Florida's medical marijuana program and desires to imminently participate in it. The sole reason he will not participate in that program is that he faces the real and immediate threat of losing his Second Amendment rights if he does so. The Challenged Sections and Regulations, as applied to individuals who reasonably and immediately wish to participate in a state's medical marijuana program, violate the Second Amendment.

20.     Beyond this Constitutional issue, the Defendants' enforcement of the Challenge Sections and Challenged Regulations violates the Rohrabacher-Farr Amendment. This enforcement punishes medical marijuana patients such as Cooper and Hansell for actions that comply with Florida's medical marijuana laws. Punishment of individuals who are compliant with state law amounts to interference with Florida's medical marijuana program in violation of the Rohrabacher-Farr Amendment. *See McIntosh*, 833 F. 3d at 1176-1177; *Bilodeau*, 24 F. 4th at 714 (1st Cir. 2022).

21.     Further, this enforcement precludes persons who are qualified and desire to participate in the state medical marijuana program, such as Franklin, from doing so. This further demonstrates how the Defendants' enforcement of the Challenged Sections and Regulations prevents states from giving practical effect to their medical marijuana laws.

22.     Therefore, to stop these ongoing violations of the Second Amendment and/or the Rohrabacher-Farr Amendment, the Plaintiffs seek a judgment from this Court (a) declaring that the Challenged Sections and the Challenged Regulations violate the Second Amendment as applied to medical marijuana patients who are compliant with state law and those reasonably intending to participate in the state medical marijuana program, and (b) enjoining the Defendants from enforcing the Challenged Sections and the Challenged Regulations as applied to state medical marijuana patients, and/or, in the alternative, (c) declaring that the Defendants' enforcement of the Challenged Sections and the Challenged Regulations prevents the implementation of Florida's medical marijuana program in violation of the Rohrabacher-Farr Amendment, and (d) enjoining the Defendants from expending any federal funds to defend or enforce the Challenged Sections and the Challenged Regulations on that basis.

## Jurisdiction and Venue

23.     The subject matter of this case is within the original and exclusive jurisdiction of the federal courts of the United States. Specifically, the Plaintiffs seek relief pursuant to 28 U.S.C. §§ 1983, 2201, 2202, and 2412. Therefore, this case presents a federal question pursuant to 28 U.S.C. § 1331 and this Court has jurisdiction.

24.     FDACS, which Commissioner Fried leads in her official capacity, is headquartered in Tallahassee. Further, Cooper is a resident of Milton, Florida, which is within the Northern District. Hansell is a resident of Miami, Florida. Franklin is a resident of Fort Myers, Florida. The actions described in paragraph 31 below, which give rise to Cooper's challenge, occurred within the Northern District. Therefore, venue is proper in this district pursuant to 28. U.S.C. § 1391(e).

## Parties

25.     Commissioner Fried is a natural person and a citizen of the United States and of the State of Florida. As stated previously, FDACS, which Commissioner Fried leads in her official capacity, is an agency of the State of Florida.

26.     FDACS is the state agency responsible for, amongst other matters, the issuance of licenses permitting eligible Floridians to engage in the concealed carry of weapons and firearms. *See* § 790.06(1), Fla. Stat.

27.     Further, FDACS regulates multiple aspects of Florida's medical marijuana program.[1] An applicant for a Medical Marijuana Treatment Center ("MMTC") license must possess, amongst other things, a "valid certificate of registration issued by [FDACS]." *See* § 381.986(8)(b)2, Fla. Stat. An MMTC also must follow the horticultural and agricultural practices set forth in Chapter 581, Florida Statutes and regulated under FDACS' authority.[2] *See* § 381.986(8)(e)6.c and d; § 581.035, Fla. Stat. Further, an MMTC must apply to FDACS for an Edibles Food Establishment Permit in order to sell medical marijuana in edible form. *See* § 381.986(8)(e)8; 500.12, Fla. State; Rule 5K-11.002, Florida Administrative Code. All consumer complaints relating to Florida's medical marijuana industry are directed to FDACS.[3]

28.     In her official capacity, Fried works diligently to ensure that the laws under her jurisdiction are given full effect. This includes ensuring that safe and eligible Floridians are able to obtain a concealed weapon or firearm license. This

---

[1] As a general matter, Commissioner Fried, in her official capacity, has "supervision of matters pertaining to agriculture except as otherwise provided by law." Fla. Const., Art. IV, § (4)(d)

[2] Florida MMTC's are required by state law to be vertically integrated, meaning they must all grow their own medical marijuana, as well as processing and selling it.

[3] *See* https://www.fdacs.gov/Cannabis-Hemp/Medical-Marijuana/For-Consumers/Report-Your-Concerns-About-Medical-Marijuana

also involves making sure that qualified Florida patients may avail themselves of a safe and regulated medical marijuana program without legal recourse.

29.     Cooper is a Florida resident and a qualified medical marijuana patient. She takes and has taken medical marijuana in compliance with the state's medical marijuana laws. She participates in the state medical marijuana program not only because of the benefits she obtains from such medical use, but also in reliance upon the state and federal laws and regulations allowing her to do so lawfully and without risk of criminal prosecution.

30.     Cooper is a widow whose late husband owned firearms for their family's personal protection while they resided together. Currently, Cooper runs a small business. Cooper wishes to purchase a firearm for her personal protection both inside and outside of her home.

31.     Cooper attempted to exercise her Second Amendment rights by purchasing a firearm on March 15, 2022. She went to a gun store in Milton, Florida, but the store denied her purchase based upon Form OMB No. 1140-0020 ("Form") (see Exhibit B, attached), which is one of the Challenged Regulations. Specifically, Cooper answered "yes" in response to Question 11(e) on the Form, which states, "Are you an unlawful user of, or addicted to, marijuana…or any other controlled substance?" The Form goes on to state that such marijuana use "remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for

medicinal or recreational purposes in the state where" the perspective purchaser resides. *Id.*[4]

32.     Hansell is Florida resident and a qualified medical marijuana patient. She is also a veteran of the United States Army who served honorably in Afghanistan and elsewhere. During her time in service, she suffered physical injuries resulting from jumping out of helicopters, as well as Post Traumatic Stress Disorder. Hansell uses medical marijuana to successfully treat these issues. She participates in the state medical marijuana program not only because of the benefits she obtains from such medical use, but also in reliance upon the state and federal laws and regulations allowing her to do so lawfully and without risk of criminal prosecution.

33.     Hansell wishes to possess a firearm for personal protection in her home and elsewhere.

34.     Hansell attempted to exercise her Second Amendment rights by purchasing a firearm on March 15, 2022. She went to a gun store in Miami, Florida, but the store denied that purchase based upon her response to Question 11(e) on the Form that she is an "unlawful user" of medical marijuana, as defined in the Challenged Regulations.

---

[4] Although some states have decriminalized marijuana for all users and not just those deemed medically qualified, Florida has not. Therefore, this challenge relates only to the Challenged Sections and Challenged Regulations' application to medical marijuana patients in compliance with the laws of their state.

35.     Franklin is a Florida resident, a retired law enforcement officer, and the owner of a firearm. He also meets the criteria of a "qualified retired law enforcement officer," pursuant to 18. U.S.C. § 926C, which grants him federal permission to carry a concealed firearm.

36.     Franklin consulted with a qualifying physician permitted to recommend the use of medical marijuana pursuant to Florida law on March 16, 2022. The qualifying physician determined that Franklin is eligible to receive medical marijuana pursuant to Florida law based on a qualifying medical condition.

37.     Franklin wishes to avail himself of the state medical marijuana program both because of the benefits he believes he could obtain from such medical use and due to the state and federal laws allowing him to do so lawfully and without risk of criminal prosecution. However, Franklin will not participate in Florida's medical marijuana program on the sole basis that doing so would subject him to the Challenged Sections and Regulations, therefore prohibiting him from exercising his right to possess or purchase a firearm.

38.     Attorney General Garland heads the Department. In his official capacity, he is responsible for executing and administering the laws of the United States, including the Challenged Sections. The Rohrabacher-Farr Amendment serves as a restriction on funds appropriated to Attorney General Garland and the Department.

39.     ATF is housed within the jurisdiction of Attorney General Garland and the Department. ATF's jurisdiction, according to its website, is focused on "protect[ing] our communities from violent criminals, criminal organizations, the illegal use and trafficking of firearms, the illegal use and storage of explosives, acts of arson and bombings, acts of terrorism, and the illegal diversion of alcohol and tobacco products."

40.     Director Restaino, in his official capacity, is responsible for executing and administering the ATF's efforts. This includes the enforcement and promulgation of the Challenged Regulations. Further, as ATF falls within the Department, the Rohrabacher-Farr Amendment restricts funds appropriated to Director Restaino and ABT.

41.     The United States is a proper Defendant in this action pursuant to 5 U.S.C. § 702.

## Statement of Facts

### The Challenged Sections and the Challenged Regulations

42.     Section 922(d)(3) of the Federal Criminal Code makes it unlawful to "sell or otherwise dispose of any firearm or ammunition to any person" who is an

"unlawful user of or addicted to any controlled substance (as defined in section 102

of the Controlled Substances Act (21 U.S.C. 802))."[5]

43.    ATF has adopted regulations which specifically define "controlled

substance" as including marijuana. 27 C.F.R. § 478.11. Those regulations also define

"unlawful user of or addicted to any controlled substance" as:

> A person who uses a controlled substance and has lost the power of
> self-control with reference to the use of controlled substance; and
> any person who is a current user of a controlled substance in a manner
> other than as prescribed by a licensed physician. Such use is not limited
> to the use of drugs on a particular day, or within a matter of days or
> weeks before, but rather that the unlawful use has occurred recently
> enough to indicate that the individual is actively engaged in such
> conduct. A person may be an unlawful current user of a controlled
> substance even though the substance is not being used at the precise
> time the person seeks to acquire a firearm or receives or possesses
> a firearm. An inference of current use may be drawn from evidence of
> a recent use or possession of a controlled substance or a pattern of use
> or possession that reasonably covers the present time, e.g., a conviction
> for use or possession of a controlled substance within the past year;
> multiple arrests for such offenses within the past 5 years if the most
> recent arrest occurred within the past year; or persons found through a
> drug test to use a controlled substance unlawfully, provided that the test
> was administered within the past year. For a current or former member
> of the Armed Forces, an inference of current use may be drawn from
> recent disciplinary or other administrative action based on confirmed

---

[5] Pursuant to section 922(d), indictment for or conviction of a federal crime does
not always lead to the loss of a person's Second Amendment Rights. Specifically,
only those facing or convicted of a crime "punishable by imprisonment for a term
exceeding one year" or specific designated offenses face such repercussions. *See*
Section 922(d)(1). Accordingly, as will be discussed further below, the federal
illegality of marijuana is not, in and of itself, a basis for the loss of a person's gun
rights. There are other federal crimes of at least similar magnitude (i.e., those
punishable by less than a year imprisonment) which do not carry this consequence.

drug use, e.g., court-martial conviction, nonjudicial punishment, or an administrative discharge based on drug use or drug rehabilitation failure.[6]

(Emphasis added)

44.     Section 922(g)(3) of the Federal Criminal Code prohibits any such "unlawful user" from possessing or receiving "any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

45.     Stemming from these prohibitions, ATF has promulgated the Form. As previously stated, anyone seeking to legally purchase a firearm must complete this form and any self-identifying "unlawful user" of medical marijuana must be denied.

46.     As the Form and 27 C.F.R. § 478.11 make clear, the Defendants' promulgated interpretation of "unlawful user" includes medical marijuana patients who are in compliance with their state medical marijuana laws.

<u>History and Tradition of Medical Marijuana</u>

47.     Researchers have found evidence of the medicinal use of marijuana from as early as 5,000 years ago. *Grinspoon & Bakalar*, p. 3. In the late Eighteenth Century in England, the following medical uses were noted:

The English clergyman Robert Burton, in his famous work *The Anatomy of Meloncholy*, published in 1621, suggested the use of

---

[6] Although this provision refers to controlled substances that are "prescribed by a licensed physician," Florida physicians do not actually "prescribe" medical marijuana. Instead, they determine whether the person consulting with them meets the state definition of a qualified patient and, if so, the physician may recommend the use of medical marijuana for their qualifying medical condition.

cannabis in the treatment of depression. The *New English Dispensatory* of 1764 recommended applying hemp root to the skin for inflammation, a remedy that was already popular in eastern Europe. The *Edinburgh New Dispensary* of 1794 included a long description of the effects of hemp and stated that the oil was useful in the treatment of coughs, venereal disease, and urinary incontinence. A few years later the physician Nicholas Culpepper summarized all the conditions for which cannabis was supposed to be medically useful.

*Id.*, p. 3-4.

48.     Marijuana reached its medical "heyday" in the west between 1840 and 1900. *Id.*, p. 4. During that time, "more than 100 medical papers were published in the western medical literature recommending it for various illnesses and discomforts." *Id.* Doctors in America began to prescribe marijuana around 1842, and it appeared in the United States Dispensatory in 1854 (although classified as a "powerful narcotic"). *Id.*

49.     In 1937, the Marihuana Tax act imposed significant financial and administrative hurdles on the use of marijuana. *Id.*, p. 8. That law was not "directly aimed" at medical marijuana, but rather was intended to "discourage recreational" use. *Id.* The costs and burdens associated with this law "made medical use of cannabis difficult," although not illegal. *Id.*; *see also Gonzalez*, 545 U.S. at 11.

50.     Marijuana was removed from the United States Pharmacopeia and National Formulary in 1941, effectively marking the end of its legal medical use during that period. *Id.*

51.    In 1996, California became the first state to permit the use of medical marijuana since the aforementioned times. Currently, 37 states, the District of Columbia, Guam, Puerto Rico, and the U.S. Virgin Islands all have medical marijuana programs. Florida is one of those states.

52.    The Rohrabacher-Farr Amendment first passed in federal fiscal year 2015, and has been a part of every federal budget since. *Bilodeau*, 24 F. 4th at 713.

<u>History and Tradition of Firearm Regulations</u>

53.    As previously stated, there were no firearm restrictions on or around the time of the Second Amendment's ratification precluding marijuana users from possessing or purchasing firearms. Further, it does not appear there were any laws which made the use of any particular substance so improper as to forfeit the right to bear arms.

54.    The closest restriction that the Plaintiffs are aware of was a late Nineteenth Century Missouri state law prohibiting the use of a firearm while intoxicated. *See State v. Shelby*, 90 Mo. 302, 2 S.W. 468 (1886). However, the Plaintiffs do not contest that an individual should not use or possess a firearm while under the influence of marijuana or any other legal or illegal substance that could affect their ability to safely use it at that moment. Rather, they contest laws that declare medical marijuana patients too dangerous to possess a firearm generally.

55.     A review of case law and pertinent research suggests that a prohibition against possessing firearms was at least largely reserved for those deemed particularly dangerous. This prohibition stems from a similar English tradition of "disarming violent or other dangerous persons." *See Greenlee*, p. 257. Such persons "throughout English history were often those involved in or sympathetic to rebellions and insurrections." *Id.* This was particularly true between and around the time of the Stuart Restoration in 1660 and the Glorious Revolution in 1688. *Id.* at 259. The Supreme Court has deemed this period "particularly instructive" in Second Amendment analysis. *Bruen*, 597 U.S. at 34; *see also Heller*, 554 U.S. at 592-593.

56.     This tradition is reflected in the debates that eventually led to the Bill of Rights and the ratification of the Second Amendment. At the Massachusetts ratifying convention, Samuel Adams argued that any constitution the colonies adopted must never "prevent the people of the United States who are peaceable citizens, from keeping their own arms." *Binderup v. Attorney General of the United States*, 836 F. 3d 336, 367 (3d Cir. 2016) (en banc) (Hardiman, concurring in part) *citing* Journal of Convention: Wednesday February 6, 1788 *reprinted in Debates and Proceedings in the Convention of the Commonwealth of Massachusetts Held in the Year 1788*, at 86 (Boston, William White 1856).

57.     "Peaceable" at that time meant non-violent, not purely law abiding. *Greenlee*, p. 266.

58.     At the Pennsylvania ratifying convention, a group of delegates issued a report arguing that citizens "have a personal right to bear arms 'unless for crimes committed, or real danger of public injury.'" *U.S. v. Skoien*, 614 F. 3d 638, 640 (7th Cir. 2010) *citing* Bernard Schwartz, 2 *The Bill of Rights: A Documentary History* 662, 665 (1971).

59.     Further, at the New Hampshire convention, delegates proposed that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion." *Binderup*, 836 F. 3d at 367 *citing* Schwartz, 2 *The Bill of Rights: A Documentary History* at 761.[7]

60.     As it relates to criminal behavior, felons and violent misdemeanants did not face the loss of their Second Amendment rights until 1938. *U.S. v. Skoien*, 614 F. 3d 638, 640 (7th Cir. 2010) *citing* Federal Firearms Act, c. 850, § 2(f), 52 Stat. 1250, 1251. Even that law only applied to "a few violent offenses," not all felonies. *Id.* This led one judge to conclude that it is "inconclusive at best" whether such a restriction against all felons would fit the history and tradition of the Second Amendment. *Id.* at 650-651 (Sykes, dissenting).

---

[7] *Heller* deemed these Massachusetts, Pennsylvania, and New Hampshire proposals relevant to its holding that the Second Amendment reflects an individual right that was "widely understood" during that pertinent time period. 554 U.S. at 604-605.

61.     Some courts and scholars have concluded that such persons would be historically excluded from the Second Amendment's protections because those rights were only extended to "virtuous citizens." *Binderup*, 836 F. 3d at 348. (Internal citations omitted). Members of one court have noted that this category would "undoubtedly" include violent criminals, but would also cover "any person who has committed a serious criminal offense, violent or non-violent." *Id.* However, other members of that same court have deemed this "virtue standard" to be "implausible" and "closely associated with pre-*Heller* interpretations of the Second Amendment." *Id.* at 371 (Hardiman, concurring in part and concurring in the judgments). Neither *Bruen* nor *Heller* discusses or references this "virtuous citizen" theory.

62.     None of the federal case law relating to whether marijuana users may be stripped of their Second Amendment rights applies the historical analysis that *Bruen* requires. In *U.S. v. Yancey*, a state-and-federally-illegal user of marijuana challenged section 922(g)(3). 621 F. 3d 681, 682 (7th Cir. 2010). The Court held, pursuant to an intermediate scrutiny analysis, that this subsection was "substantially related to an important government objective." *Id.* at 683. It concluded further that "keeping guns from habitual drug abusers is analogous to disarming felons." *Id.* at 684. The Court also stated its belief that even a non-violent felon "is more likely than a non-felon to engage in illegal and violent gun use." *Id.* at 685. Going even

further, it asserted that "habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms." *Id.* at 685. All of this was held to tie into the government objectives of "suppressing armed violence." *Id.* at 684.

63.    *Yancy* did not predicate its holding on the history and tradition of the Second Amendment in any way.

64.    *U.S. v. Carter* also dealt with a challenge to section 922(g)(3) by a person engaged in the state-and-federally illegal drug trade. 669 F. 3d 411 (4th Cir. 2012). Although the Court remanded for a full factual consideration of the now-defunct second prong of the pre-*Bruen* Second Amendment analysis, it found "plausible" several arguments relating to the "danger of mixing guns and drugs." *Id.* at 419-420. This included being more likely to have "hostile run-ins with law enforcement," being more likely to "interact with a criminal element," and other considerations relating to the state-and-federally illegal drug trade. *Id.*

65.    *Carter* stated that "the Anglo-American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous." *Id.* at 415. Beyond this broad assertion, the Court did not engage in any historical analysis as part of its decision. *Id.* at 416-417.

66.    Finally, *Wilson v. Lynch* dealt with a person who joined her state's medical marijuana registry, but who averred that she did not actually use medical

marijuana. 835 F. 3d 1083, 1091 (9th Cir. 2016). For that reason, the Court held that she was not a person "historically prohibited from possessing firearms under the Second Amendment." *Id.* at 1092. The government argued that, if that person did actually use medical marijuana, then she would fall outside of the Second Amendment's protections in that area. *Id.* at 1091. The Court did not affirmatively approve of or address this argument, though. *Id.* Instead, *Wilson* applied intermediate scrutiny and concluded that evidence supported "a strong link between drug use and violence." *Id.* at 1093.

67.    *Wilson* may potentially have been controlling in this area pre-*Bruen*, and other courts have relied upon it in disposing of similar challenges. *See Bradley v. U.S.*, 402 F. Supp. 3d 398 (N.D. Ohio 2019); *U.S. v. Bellamy*, 682 Fed. Appx. 447 (6th Cir. 2017).

68.    However, post-*Bruen*, this is no longer the case. Nothing in *Wilson* or its progeny discusses or relates to the historical justification for this firearms restriction. Rather, they found sufficient policy grounds for them. Therefore, these cases are legally and factually distinguishable, and they shed no light on the historical considerations now before the Court.

<u>The Rohrabacher-Farr Amendment</u>

69.    The Rohrabacher-Farr Amendment precludes Attorney General Garland, Director Restaino, and/or their predecessors, in their official capacities,

from using any Department funds "to prevent [Florida and other states or territories with medical marijuana programs] from implementing state laws that authorize the use, distribution, possession or cultivation of medical marijuana." *See Ex. A.*

70. This provision applies to more than just federal enforcement actions against a state itself. Rather, *McIntosh* held that this amendment "prohibits [the Department] from spending funds from relevant appropriations acts for the prosecution of **individuals** who engaged in conduct permitted by" state medical marijuana laws "and who fully complied with such laws." 833 F. 3d. at 1176-1177. (emphasis added); *see also Bilodeau*, 24 F. 4th at 713 ("We agree with this reading of the rider and conclude, as the Ninth Circuit did, that the [Department] may not spend funds to bring prosecutions if doing so prevents a state from giving practical effect to its medical marijuana laws.")

71. Further, *McIntosh* made clear that Rohrabacher-Farr precludes prosecution of individuals "**at a minimum**." *Id.* at 1177. (emphasis added).

72. The Rohrabacher-Farr Amendment was intended to preclude actions which would prevent a state from giving "practical effect to its medical marijuana laws." *McIntosh*, 833 F. 3d at 1176; *Bilodeau*, 24 F. 4th at 713. In determining what would fall under this umbrella, *Bilodeau* considered whether federal enforcement or requirements would "skew a potential participant's incentives against entering the

market" and "deter the degree of participation in [the state's] market that [it] seeks to achieve." *Id.* at 714.

73.     Attorney General Garland, Director Restaino, and/or their predecessors, in their official capacities, are expending and have expended federal funds to promulgate and enforce the Challenged Sections and the Challenged Regulations.

74.     The Defendants' enforcement of the Challenged Sections and Challenged Regulations against medical marijuana patients who comply with state law punishes them for what is legally permitted and protected conduct. This enforcement also serves to dissuade qualified patients such as Franklin from participating in the state medical marijuana program. In those ways, the Defendants' enforcement of these provisions prevents the implementation of Florida's medical marijuana program in much the same manner that *McIntosh* and *Bilodeau* held was prohibited.

<u>Basis for Plaintiffs' Claims</u>

75.     Pursuant to Article III of the United States Constitution, to have standing, a plaintiff must demonstrate: (i) an injury in fact that is both concrete and particularized as well as actual or imminent; (ii) an injury that is traceable to the conduct complained of; and (iii) an injury that is redressable by a decision of the court. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119

L.Ed.2d 351 (1992); *State ex rel. Sullivan v. Lujan,* 969 F.2d 877, 880 (10th Cir. 1992).

76.     States and agencies such as FDACS are considered to be a special class of federal litigants. *Wyoming ex. rel. Crank v. U.S.*, 539 F. 3d 1236, 1241-1242 (10th Cir. 2008) *citing Massachusetts v. E.P.A.*, 127 S. Ct. 1438, 1454 (2007); *Lacewell v. Office of Comptroller of Currency*, 999 F. 3d 130, 145 (2nd Cir. 2021). Injury in fact has been found for state entities when federal regulations or actions interfere with the "ability to enforce its legal code." *Id.* The remaining Article III standing prongs are met when the federal action directly causes this injury and declaratory and/or injunctive relief would prevent this injury going forward. *Id.*

77.     Commissioner Fried is in need of a declaration of her rights, in her official capacity, regarding the Challenged Sections and Challenged Regulations. Those laws and regulations interfere with FDACS' ability to give effect to laws within its jurisdiction. Florida law requires Commissioner Fried to issue a license permitting the concealed carry of a firearm to any individual who meets the statutory qualifications. However, the Challenged Sections and Challenged Regulations render otherwise-qualified medical marijuana patients ineligible to purchase or possess a firearm. Florida law has no such prohibition. In that way, those laws contradict Florida medical marijuana and firearm laws and prevent them from having their intended effect.

78.     Commissioner Fried, in her official capacity, is of the reasonable belief that the Challenged Sections and Challenged Regulations are unconstitutional as applied to state-law-abiding medical marijuana patients and those reasonably seeking to participate in the state medical marijuana program. Such a restriction falls outside of the history and tradition of the Second Amendment. It is also her reasonable understanding and belief that the Defendants oppose this position.

79.     Stripping Cooper and Hansell of their Second Amendment rights is a real and immediate injury to them.

80.     Cooper and Hansell are of the reasonable belief that the Challenged Sections and Regulations are unconstitutional as applied to medical marijuana patients who are in compliance with their state medical marijuana program. They abide by Florida law and participate in Florida's medical marijuana program in reliance upon the protections of the Rohrabacher-Farr Amendment. Taking such persons' Second Amendment rights falls outside of the history and tradition of the Second Amendment. It is Cooper and Hansell's reasonable understanding and belief that the Defendants oppose this position.

81.     The Challenged Sections and Challenged Regulations coerce Franklin to not participate in the Florida medical marijuana program through the threat that they will be enforced against him. This constitutes a real and immediate injury to him. *See Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 508 (1972).

82.     Franklin is of the reasonable belief that the Challenged Sections and Regulations are unconstitutional as applied to those who reasonably and imminently desire to participate in their state's medical marijuana program. Franklin is medically eligible for such a program and would participate in it but for these Second Amendment consequences. It is beyond dispute that Franklin would face the real and immediate loss of that right as soon as he participated in this program. This restriction falls outside of the history and tradition of the Second Amendment. It is Franklin's reasonable understanding and belief that the Defendants oppose this position.

83.     Prior to *Bruen*, Courts followed a two-step analysis for evaluating Second Amendment claims. *See GeorgiaCarry.org, Inc. v. U.S. Army Corp. of Engineers*, 788 F. 3d 1318, 1322 (11th Cir. 2015). First, courts would "ask if the restricted activity is protected by the Second Amendment…." *Id.* Courts would consider this by "evaluating the original public meaning of the Amendment's text," as well as the understanding of what that right entailed. *Id*. As a second step, "if necessary," the court would then "apply the appropriate level of scrutiny." *Id.*

84.     Neither *Carter*, *Yancy*, nor *Wilson* held that medical marijuana patients fall outside of the protections of the Second Amendment pursuant to its original meaning. The Plaintiffs are unaware of any case with such a holding. Rather, those

decisions all upheld the restrictions in question based on the second step in that previous analysis.

85.    However, *Bruen* deemed this test "one step too many." 597 U.S. at 10. The Court held:

> Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller*…[does] not support applying means end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.

*Id.*

86.    Any policy justifications for the Challenged Sections or Challenged Regulations are no longer relevant to this analysis. *Bruen* expressly rejected such a "judge-empowering interest-balancing inquiry" which weighs the Second Amendment rights of individuals against "other important governmental interests." 597 U.S. at 13. Instead, the sole consideration is whether the Defendants can "affirmatively prove that [their] firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 10.

87.    This historical analysis will often require "reasoning by analogy" to determine whether a current regulation is "relevantly similar" to one from a pertinent time period. *Bruen*, 597 U.S. at p. 19-20. As part of such reasoning, Courts should consider "how and why the regulations burden a law-abiding citizen's right to armed

self-defense." *Id.* Specifically, courts should look at whether such potentially analogous regulations "impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* Although courts must not "uphold every modern law that remotely resembles a historical analogue," the government must only "identify a well-established and representative historical analogue, not a historical twin." *Id.*

88.    In considering this history and tradition, *Bruen* reiterated that "constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id.* at p. 25-26. Accordingly, historical evidence long predating the 1791 ratification of the Second Amendment will likely not "illuminate" any questions relating to those rights to any significant degree.[8] *Id.* The same is true for evidence occurring significantly after such ratification. *Id.* at p. 58.

---

[8] *Bruen* recognizes that there is a scholarly debate regarding whether the Second Amendment, and the Bill of Rights generally, should be interpreted as understood at the time of its ratification or in 1868, when the Fourteenth Amendment was adopted. 597 U.S. at p. 17. As in that decision, the Court need not resolve this issue here because the Defendants cannot carry their burden to show an analogous historical regulation during either time period. In fact, there would be even less historical support for the Challenged Sections and Challenged Regulations in or around 1868, when medical marijuana was in its "heyday" in the United States. *Grinspoon & Bakalar*, p. 3.

89.     In any event, if there is any conflict between the plain text of the Second Amendment and the history and tradition surrounding any firearm regulation, "the text controls." *Id.* at p. 27.

90.     As stated previously, there is no historical tradition supporting the concept that medical marijuana patients should lose their Second Amendment rights. In fact, historical evidence shows that marijuana was considered a legitimate and legal form of medicine in England, America, and other western countries through the mid-Nineteenth and early-Twentieth Centuries. It was also discussed and researched for its medical properties in and around the time the Second Amendment was ratified. There was no law or regulation preventing marijuana users from possessing firearms in or around those time periods. Rather, such a ban did not come into existence until around the mid-Twentieth Century.

91.     Both *Bruen* and *Heller* noted in dicta that the Second Amendment protects only "law-abiding, responsible" citizens' right to bear arms. *Id.*, at p. 5; *Heller*, 554 U.S. at 635. The Plaintiffs do not contest, at least for purposes of this proceeding, that persons engaged in activity which is both state and federally illegal and which they are aware could subject them to arrest and prosecution could be deemed not "law abiding" in this context.

92.     The Individual Plaintiffs in this case are "law-abiding," at least as it relates to the history and tradition of the Second Amendment. They have not been

charged with or convicted of any crime. In fact, they may not legally be charged or prosecuted under either federal or state law for their use of medical marijuana because they comply with Florida law. Further, they participate in Florida's medical marijuana program in reliance upon the protections that Florida's medical marijuana laws and the Rohrabacher-Farr Amendment afford them.

93.     Unlike others who may take illegal actions despite the knowledge that they may be criminally punished for them, the Individual Plaintiffs take only those actions their state and federal governments have expressly permitted and protected. There is no applicable historical precedent for such an individual in any comparable circumstance being deemed outside of the Second Amendment's intended scope.

94.     Rather, the history and tradition in this area makes clear that these rights could, at least in most instances, only be taken away from those viewed as dangerous or seditious. Accordingly, the Defendants may argue that the Individual Plaintiffs' use or intended use of medical marijuana would make them "dangerous" in a manner comparable to these historical regulations.

95.     On this point, however, the Supreme Court has noted that:

> "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during

this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality."

*Bruen*, 597 U.S. at 17-18.

96.    Keeping or taking guns from "dangerous" individuals is a general societal problem that has persisted since at least the 18th century. As previously stated, there is no analogous historical regulation dealing with this problem by preventing medical marijuana users from possessing firearms. Further, there does not appear to be any relevant regulation that deemed the general use of any substance sufficient to render a person "dangerous" in this context. Accordingly, the Defendants cannot meet their burden of showing that this societal problem was dealt with through any means at all analogous to those at issue in this proceeding.

97.    Whether those engaged in non-violent activity for which they could be charged or convicted could be viewed as similarly dangerous is not before the Court. However, at least in such an instance, an individual would have evidenced an express will and decision to act in a manner they know is not legally permitted and to potentially avail themselves of the ancillary violence surrounding wholly illegal behavior (such as the illicit drug trade).

98.    The Individual Plaintiffs, though, are in compliance with state law and act in reliance on the Rohrabacher-Farr Amendment. There is no historical precedent supporting an argument that analogizes them to those seen as violent or seditious.

Any such regulation would not place a burden on compliant medical marijuana patients that is comparably justified to past laws restricting criminals' right to bear arms.

99.     Further, despite the dicta regarding "law-abiding citizens" in *Heller* and *Bruen*, the law is clear that not all persons who commit or are convicted of crimes lose their Second Amendment rights. Specifically, any person convicted of a federal crime punishable by less than one year of imprisonment does not forfeit such rights unless their offense is specifically enumerated elsewhere. *See* Section 922(d)(1). A federal first-time conviction for marijuana possession is a misdemeanor punishable by less than one year of imprisonment. *See* 21 U.S.C. § 844(a).

100.   Thus, the Defendants cannot reasonably claim that committing any illegal act at all takes a person outside of the Second Amendment's protections. Such a position exceeds the boundaries of current law, as well as the history and tradition in this area.

101.   The Defendants also cannot reasonably argue that the Individual Plaintiffs are less "law-abiding" than those convicted of federal misdemeanors. This is especially true based on those individuals' compliance with state law and reliance on the Rohrbacher-Farr Amendment's protections. If anything, they are imminently more law abiding than convicted misdemeanants who would not be deprived of their right to bear arms.

34

102.   In all of these areas, as Justice Thomas noted, the Defendants have eroded their own arguments. *See Standing Akimbo*, 141 S. Ct. at 2236. In light of the Rohrabacher-Farr Amendment, the Defendants cannot reasonably argue that medical marijuana programs render even those patients who comply with state law violent or mentally ill. The Defendants can offer no rational explanation for why federal law would expressly protect programs that essentially turns otherwise law-abiding citizens into criminals with no self-control. Such a contradictory position would fall far outside of any comparable, historical regulation in this area.

103.   In the alternative, if the Court determines that the Plaintiffs have misapprehended the *Bruen* holding and that the Defendants' current policy rationale for the Challenged Sections and Challenged Regulations is relevant, the Plaintiffs will show that there is no causal link between state-legal medical marijuana use and violence.

104.   In support of that position, the Plaintiffs can and will show through evidence that:

(a) there is no scientific evidence supporting a causal link between state-legal medical marijuana use and violence;

(b) as Florida has started and expanded its medical marijuana program, it (like many other states) has not experienced an accompanying increase in violent crime; and

(c) links between marijuana and violence that past courts have found stem from ancillary dangers inherent in the illegal drug trade that are not present for state-compliant medical marijuana patients.

105. Commissioner Fried is also of the reasonable belief that the Defendants' enforcement of the Challenged Sections and Challenged Regulations on medical marijuana patients who comply with state law violates the Rohrabacher-Farr Amendment. Such enforcement interferes with Florida laws that fall, at least partially, under Commissioner Fried's jurisdiction. By punishing compliant individuals and precluding those reasonably desiring to participate in the state medical marijuana program from doing so, the Challenged Sections and Challenged Regulations prevent Florida from giving practical effect to its medical marijuana program. It is Commissioner Fried's reasonable understanding and belief that the Defendants oppose this position.

106. Much like Commissioner Fried, both Cooper and Hansell are of the reasonable belief that the Defendants' enforcement of the Challenged Sections and Challenged Regulations prevents the implementation of Florida's medical marijuana programs. This enforcement punishes them for the very compliant and legal behavior that the Rohrabacher-Farr Amendment exists to protect. It is also their reasonable understanding and belief that the Defendants oppose those positions.

107.   Much like Commissioner Fried, Cooper, and Hansell, Franklin is of the reasonable belief that the enforcement of the Challenged Sections and Challenged Regulations prevents Florida from implementing its medical marijuana program. This enforcement precludes persons such as himself (i.e., those who value the exercise of their Second Amendment rights) from participating in that program. It is Franklin's reasonable understanding and belief that the Defendants oppose those positions.

108.   The Plaintiffs are not aware of any case that has previously applied the Rohrabacher-Farr Amendment to an action beyond the direct prosecution of individuals. However, as previously stated, *McIntosh* held that this proviso prevents prosecutions for actions in compliance with state medical marijuana programs "at a minimum." 833 F. 3d. at 1177.

109.   The real and imminent deprivation of rights that the Individual Plaintiffs face because of the Defendants' enforcement of the Challenged Sections and Challenged Regulations against medical marijuana patients who comply with state law is punishment in much the same way a prosecution would be. Although it does not put their liberty interest at stake, it costs them a core constitutional right based on the Defendants' determination that they have acted improperly.

## **Claims for Relief**

### Count I – Declaratory Relief Related to Second Amendment Violation, 42 U.S.C. § 1983

110.   The Plaintiffs reallege and incorporate by reference paragraphs 1-19, 22-72, and 75-104, as if fully set forth herein.

111.   The Challenged Sections and the Challenged Regulations, as applied to medical marijuana patients such as Cooper and Hansell who are in compliance with their state medical marijuana program, violate the Second Amendment.

112.   Cooper and Hansell are part of "the people" whom the Second Amendment protects. Their intended actions (i.e., the purchase and possession of firearms) fall within the Second Amendment's original scope.

113.   The Challenged Sections and Challenged Regulations are inconsistent with the nation's history of firearm regulation, at least during the time periods pertinent to this consideration.

114.   The Challenged Sections and Challenged Regulations also violate the Second Amendment as applied to law-abiding citizens such as Franklin who reasonably intend to participate in a state medical marijuana program.

115.   Franklin is part of "the people" who the Second Amendment protects. His current actions (i.e., owning and possessing firearms) fall within the Second Amendment's original scope.

116.   Although a qualified physician has deemed him eligible to participate in Florida's medical marijuana program, he faces the real and immediate threat of losing his Second Amendment rights if he does so. This is inconsistent with the nation's history of firearm regulation.

117.   As a direct and proximate cause of the application of the Challenged Sections and the Challenged Regulations to medical marijuana patients, the Individual Plaintiffs have suffered, continue to suffer, and will suffer irreparable harm stemming from the real and immediate inability to exercise, or the real and imminent threat of loss of, their Second Amendment rights.

118.   Further, the Challenged Sections and Challenged Regulations contradict Florida law as it relates to firearms and medical marijuana. They also serve to punish those who participate in Florida's medical marijuana program in a manner contrary to Florida law.

119.   This contradiction and interference precludes Commissioner Fried, in her official capacity, from giving full effect to state law.

120.   The Floridians affected by these provisions (i.e., those participating in the state medical marijuana program who strictly comply with its requirements) are part of "the people" who the Second Amendment protects. Florida law seeks to allow such persons to participate in this program without any legal repercussions for doing

so. Further, to the extent such medical marijuana patients do or imminently seek to purchase or possess firearms, this is within the Second Amendment's original scope.

121.   Precluding such persons from exercising their Second Amendment rights interferes with Florida law as it relates to medical marijuana and firearms, and it is inconsistent with the nation's history of firearm regulations.

122.   The Plaintiffs do not challenge the Challenged Statutes or Regulations on their face or as they apply to recreational or state-illegal drug users. Rather, the Individual Plaintiffs contend that their circumstance is wholly separate and distinct from such persons. Specifically, they operate in compliance with the law of their state and in reliance upon the Rohrabacher-Farr Amendment.

123.   Although one might argue that there is a historical tradition of those charged or convicted of at least some crimes losing their Second Amendment rights, there is no analogous regulation imposing penalties on those in any position similar to the Individual Plaintiffs.

124.   The Plaintiffs contend that there exists an actual controversy regarding whether the Challenged Sections and Challenged Regulations are unconstitutional as applied to Florida medical marijuana patients and those reasonably intending to become Florida medical marijuana patients.

125.   The Plaintiffs possess no other adequate remedy at law through which to resolve these disputes and request a declaratory judgment.

126.    The Plaintiffs have incurred and will incur attorney's fees as a proximate result of having to initiate and prosecute this action.

## Count II – Injunctive Relief relating to violation of the Second Amendment, 42 U.S.C. § 1983

127.    The Plaintiffs reallege and incorporate by reference paragraphs 1-19, 22-72, and 75-104, as if fully set forth herein.

128.    The Individual Plaintiffs, as pled, have experienced, are experiencing, and will imminently experience irreparable harm for as long as the Challenged Sections and Challenged Regulations continue to have their current, as-applied effect on state medical marijuana patients.

129.    Further, Commissioner Fried, in her official capacity, will continue to experience irreparable harm for as long as Florida's medical marijuana and firearm laws are federally undermined, contradicted, and interfered with.

130.    The Plaintiffs have no plain, adequate, or complete remedy to redress the wrongs addressed herein other than this action. An award of monetary damages is not adequate to remedy the potential loss of and/or infringement upon the Individual Plaintiffs' Second Amendment rights.

131.    Monetary damages would also not remedy the undermining of state law affecting Commissioner Fried, in her official capacity.

132. Accordingly, the Plaintiffs seek an injunction preventing the Defendants from enforcing the Challenged Sections and Challenged Regulations as applied to Floridians who are in compliance with state medical marijuana laws.

133. Such an injunction will serve the public interest by ensuring that the core constitutional rights of state-law-abiding Floridians are protected and that Commissioner Fried, in her official capacity, can give full effect to state medical marijuana and firearm laws.

134. The Plaintiffs have incurred and will incur attorney's fees as a proximate result of having to initiate and prosecute this action.

<u>Count III – Declaratory Relief Related to the Rohrabacher-Farr Amendment,
42 U.S.C. § 1983</u>

135. The Plaintiffs reallege and incorporate by reference paragraphs 1-14, 20-46, 52, 69-76, and 105-109, as if fully set forth herein.

136. Much like in *McIntosh*, the Defendants and/or their predecessors' expenditure of funds to promulgate and/or enforce the Challenged Sections and Challenged Regulations serves to punish Cooper and Hansell even though they are in compliance with state law.

137. This enforcements also serves to prevent Floridians who are eligible to participate in the state medical marijuana program, such as Franklin, from doing so. As discussed in *McIntosh* and *Bilodeau*, this constitutes a violation of the

Rohrabacher-Farr Amendment because it prevents the implementation of Florida's medical marijuana program.

138.   The Plaintiffs contend that there exists an actual controversy regarding whether the Defendants' enforcement of the Challenged Sections and Challenged Regulations against medical marijuana patients who comply with state law prevents the implementation of Florida's medical marijuana program in this manner.

139.   The Plaintiffs possess no other adequate remedy at law through which to resolve these disputes and request a declaratory judgment.

140.   The Plaintiffs have incurred and will incur attorney's fees as a proximate result of having to initiate and prosecute this action.

<u>Count IV – Injunctive Relief relating to violation of the Rohrabacher-Farr Amendment, 42 U.S.C. § 1983</u>

141.   The Plaintiffs reallege and incorporate by reference paragraphs 1-14, 20-46, 52, 69-76, and 105-109, as if fully set forth herein.

142.   The Plaintiffs, as pled, have experienced, are experiencing, and will continue to experience irreparable harm for as long as the Defendants expend funds to promulgate and/or enforce the Challenged Sections and Challenged Regulations in a manner that serves to punish Florida medical marijuana patients who comply with state law. In doing so, the Defendants prevent the implementation of Florida's medical marijuana program in violation of the Rohrabacher-Farr Amendment.

43

143.   The Plaintiffs have no plain, adequate, or complete remedy to redress the wrongs addressed herein other than this action. An award of monetary damages is not adequate to remedy the potential inability for Florida to implement its medical marijuana programs, the Defendants' illegal use of funds to prevent such implementation, or the continued deprivation of medical marijuana patients' Second Amendment rights despite their compliance with state law.

144.   Accordingly, the Plaintiffs seek an injunction preventing the Defendants from expending any funds to enforce or apply the Challenged Sections and Challenged Regulations to Floridians who are in compliance with state medical marijuana laws.

145.   Such an injunction will serve the public interest by ensuring that the state's medical marijuana program is implemented, that federal funds are not spent in a manner contrary to the Rohrabacher-Farr Amendment, and that the constitutional rights of medical marijuana patients who comply with state law are protected.

146.   The Plaintiffs have incurred and will incur attorney's fees as a proximate result of having to initiate and prosecute this action.

## **Prayer for Relief**

WHEREFORE, the Plaintiffs respectfully request that the Court enter judgment in their favor as follows:

A)      Declare that the Challenged Sections and the Challenged Regulations are unconstitutional as applied to medical marijuana patients who are in compliance with state law,

B)      Permanently enjoin the Defendants from applying or enforcing the Challenged Sections and/or the Challenged Regulations against medical marijuana patients who are in compliance with state law, and/or, in the alternative,

C)      Declare that the Defendants' enforcement of the Challenged Sections and the Challenged Regulations against state medical marijuana patients who comply with state law prevents Florida from implementing its medical marijuana program contrary to the Rohrabacher-Farr Amendment, and

D)      Permanently enjoin the Defendants from expending any funds to enforce or apply the Challenged Sections and the Challenged Regulations against medical marijuana patients who comply with state law, and

E)      Award the Plaintiffs their reasonable attorney's fees and costs pursuant to 28 U.S.C. § 2412, and

F)      Grant any such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ William D. Hall
William D. Hall
Florida Bar No. 67936
Daniel R. Russell
Florida Bar No. 63445
Jordane Wong
Florida Bar No. 1030907
**DEAN, MEAD & DUNBAR**
106 E. College Ave., Suite 1200
Tallahassee, Florida 32301
Tel: (850) 999-4100
Fax: (850) 577-0095
whall@deanmead.com
drussell@deanmead.com
jwong@deanmead.com
kthompson@deanmead.com
*Attorneys for Plaintiffs*


/s/Adam J. Komisar
ADAM J. KOMISAR
Fla. Bar No: 86047
KOMISAR SPICOLA, P.A.
Adam@KomisarSpicola.com
P.O. Box 664
Tallahassee, Florida 32302
Telephone No.:  (850) 328-4447
Fax No.: (850) 320-6592
www.KomisarSpicola.com
Co-Counsel for Plaintiff Nicole Hansell

CAMINEZ & YEARY, P.A.

/s/ Ryan A. Yeary
Ryan A. Yeary
Florida Bar No.: 71261
Kareem Todman
Florida Bar No. 109295
1307 South Jefferson Street
Monticello, Florida 32344
(850) 997-8181 - Phone
(850) 997-5189 – Facsimile
ryeary@caminezlaw.com
ktodman@caminezlaw.com
service@caminezlaw.com
Co-Counsel for Plaintiff Neill Franklin

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ *William D. Hall*
William D. Hall